IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

FILED
OCT 27 2014
Clerk, U.S. District Court
District Of Montana
Billings

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 14-51-BLG-SPW |
| Plaintiff, | |
| vs. | OPINION AND ORDER |
| CANDELARIO ALBERTO GARCIA, | |
| Defendant. | |

Defendant Candelario Alberto Garcia is charged with possession with intent to distribute methamphetamine and felon in possession of a firearm. He has moved to suppress the evidence that forms the basis of Counts I and II of the Indictment. (Doc. 22). On October 17, 2014, the Court held an evidentiary hearing on Garcia's motion. The Court heard from former Livingston Police Department (LPD) Detective Shawn Misner and LPD Sergeant John Leonard. Having read and reviewed the parties' submissions and the applicable law, and having heard the testimony of the witnesses noted above, the Court DENIES Garcia's motion.

I. **Background**

On July 15, 2013, Sgt. John Leonard, Assistant Chief Johnson, and Detective Harris responded to a call from an assault victim at a gas station in

1

Livingston, Montana. The victim provided Sgt. Leonard with a description and possible address for the suspect. The officers went to the address, which belonged to Garcia. Garcia admitted to the assault and Sgt. Leonard cited him with a misdemeanor. Chief Johnson and Det. Harris smelled marijuana coming from Garcia's house during the assist.

During the timeframe at issue, Det. Misner was the acting narcotics detective for the LPD and was a member of the Missouri River Drug Task Force. Two days after the assault, Chief Johnson and Det. Harris reported to Det. Misner that they smelled marijuana at Garcia's house when they were assisting Sgt. Leonard with the assault investigation. Sgt. Leonard advised Det. Misner that Garcia had a non-extraditable warrant for his arrest out of California for a probation violation, and that Garcia had a lengthy criminal history of drug and weapons charges. A couple days later, Sgt. Leonard told Det. Misner that he had spoken with Garcia's probation officer who told him that Garcia's criminal history included marijuana and methamphetamine use and distribution, and that Garcia was a "higher up" in a violent gang out of Central Valley, California, called the College Street Bulldogs. As a result of this information, Det. Misner placed Garcia's house under surveillance, but discovered nothing.

Ten days after Garcia was cited for assault, Det. Misner decided to follow up on the marijuana odor Chief Johnson and Det. Harris had detected at Garcia's

house. Sgt. Leonard and Montana Highway Patrol Trooper Nilan provided assistance. The three drove to Garcia's house and parked up the block, out of sight. Sgt. Leonard and Trooper Nilan were in uniform. Det. Misner wore street clothes and a ballistic vest marked "Police" in yellow letters. All of them were armed. They walked down the sidewalk to Garcia's house. Sgt. Leonard and Trooper Nilan stopped short of Garcia's front door and remained on the north side of the house, out of sight.

Det. Misner knocked on Garcia's front door. Det. Misner noticed an open window on the front of the house and smelled marijuana coming from inside. Garcia opened the front door. He was naked. Det. Misner asked Garcia if he would put some clothes on and come outside to talk. Garcia said he would, went back in the house, shut the door behind him, and came out a couple minutes later fully clothed. Garcia walked down his front steps and met Det. Misner on the landing adjacent to the sidewalk. Garcia saw Trooper Nelson and Sgt. Leonard as he came down the steps and said, "Hey Leonard" to Sgt. Leonard.

Det. Misner identified himself to Garcia and told Garcia he needed to conduct a pat down. Garcia said okay. Garcia swears via affidavit that he was handcuffed at this point. Det. Misner and Sgt. Leonard testified at the hearing that no officer ever handcuffed Garcia at any point during the encounter. After the pat down, Det. Misner told Garcia that he was there because law enforcement had

3

smelled marijuana at Garcia's house ten days earlier when investigating the assault. Det. Misner told Garcia he could smell marijuana coming from the house and asked Garcia if he had a Montana Medical Marijuana Card. Garcia explained he used to have a California card, but did not have a Montana card. Det. Misner asked Garcia if he had any marijuana on his person or in his house. Garcia said he had half an ounce of marijuana in the house. Det. Misner asked Garcia for consent to search the house. Garcia refused. Det. Misner told Garcia he was going to apply for a search warrant for the house and Garcia's Chevrolet Impala. Det. Misner told Garcia he was not allowed back in his house or in his car pending the search and that he could stay during the search but was also free to leave. Garcia opted to leave and walked away down the street. Approximately 10 minutes passed from the time Det. Misner knocked on the door until Garcia left the house.

After Det. Misner obtained a search warrant for Garcia's house and car, he and Officer Emanuel conducted a walk through to clear the area for any dangers to Officer Emanuel's drug dog. Officer Emanuel's dog, Bobi, conducted a K-9 sniff and Bobi alerted to the odor of narcotics in a bedroom at the rear of the house. Officer Emanuel directed Det. Misner to the room where Bobi had alerted. Det. Misner discovered marijuana, methamphetamine, body armor, drug paraphernalia, a pistol, and other relevant items.

## II.    Discussion

Garcia argues that he was in custody when Det. Misner interrogated him without advising him of his *Miranda* rights and that any statements he made at that time must thus be suppressed. Garcia argues that without his statements, the search warrant application lacks probable cause and thus everything discovered pursuant to the search warrant is fruit of the poisonous tree and must be suppressed. The government opposes the motion and contends that because Garcia was never in custody, *Miranda* warnings were not necessary and that the search warrant was adequately supported by probable cause.

A. **Whether Garcia was in Custody When He was Questioned**

Garcia argues that he was in custody "almost immediately," because three law enforcement officers came to his door, Det. Misner patted him down and began asking him questions about marijuana, and placed him in handcuffs. (Doc. 23 at 8). Even if he was not placed in handcuffs, Garcia contends he was still in custody because he was confronted with the fact his home smelled like marijuana, asked if he possessed marijuana, and was not told he was free to leave until after he admitted to possessing marijuana. (Doc. 25 at 8).

The first question is whether law enforcement's interaction with Garcia was a seizure or was voluntary and consensual. *United States v. Crapser*, 472 F.3d 1141, 1145 (9th Cir. 2007). "When an encounter is voluntary, no constitutionally protected right is implicated." *United States v. Summers*, 268 F.3d 683, 686 (9th

5

Cir. 2001). "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002). This includes the "so-called 'knock and talk' exception to the warrant requirement wherein the police may temporarily seize the suspect outside the home (or at the threshold) provided they have reasonable suspicion of criminal activity." *Crapser*, 472 F.3d at 1148.

On the other hand, if the individual is seized and in custody, an officer must give *Miranda* warnings before interrogating him. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). A defendant is in custody when "a reasonable person in such circumstances would conclude after brief questioning [that] he or she would not be able to leave." *United States v. Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009) (internal quotation marks and citation omitted). This determination is based on the totality of the circumstances. Factors relevant to the inquiry include: "the language used to summon the individual; the extent to which the defendant is confronted with evidence of guilt; the physical surroundings of the interrogation; the duration of the detention; and the degree of pressure applied to detain the individual." *Id.* (numbering in original omitted).

In *Crapser*, the Ninth Circuit found that an encounter with law enforcement virtually identical to Garcia's was consensual. 472 F.3d at 1141-1148. There, four police officers parked where they were not immediately visible from Crapser's room. *Id.* at 1143. They politely knocked on Crapser's door; they did not demand that he open the door. *Id.* at 1146. They waited patiently for him to decide to come outside approximately two minutes later. *Id.* Although the officers were armed, they made no effort to draw Crapser's attention to their weapons, nor did they use any physical force against him. *Id.* The encounter occurred in the middle of the day on a sidewalk in public view. *Id.* When the officers asked Crapser about drugs, he pulled a syringe of methamphetamine out of his pocket and said, "this is all I have on me." *Id.* at 1144. The entire event lasted approximately five minutes. *Id.* Although four officers were present, only two spoke to Crapser. *Id.* The police did not block Crapser, suggest to him that he could not leave, give him orders or otherwise assert authority over his movements. *Id.* Based on the totality of Crapser's interaction with law enforcement, the Ninth Circuit held that the "knock and talk" resulted not in a seizure, but in a voluntary, consensual encounter between Crapser and law enforcement. *Id.* at 1147.

Here, like in *Crapser,* considering the totality of the circumstances, Garcia was not "seized" within the meaning of the Fourth Amendment. Sgt. Leonard, Trooper Nilsen, and Det. Misner parked their cruisers where they were not

7

immediately visible to Garcia. Det. Misner knocked on Garcia's front door and waited for him to answer. He did not demand that Garcia open up or otherwise aggressively command him to come out. When Garcia answered the door in the nude, Det. Misner politely asked him if he would put some clothes on and come outside to talk, to which Garcia answered he would. Det. Misner "did not demand that [Garcia come outside]; he asked." *Crapser*, 472 F.3d at 1146. Garcia "voluntarily agreed" to come out and talk with Det. Misner. *United States v. Redlightning*, 624 F.3d 1090, 1103 (9th Cir. 2010). Also like the officers in *Crapser*, Det. Misner waited patiently for approximately two minutes while Garcia went back in his house and put some clothes on.

When Garcia came out of his house, "[t]here was no application of force, no intimidating movement, no overwhelming show of force ... no blocking of exits, no threat, no command, not even an authoritative tone of voice." *Drayton*, 536 U.S. at 204. On the contrary, Garcia conversationally addressed Sgt. Leonard when he saw him and said "hey." When Det. Misner told Garcia he was going to pat him down, Garcia said okay. Although Garcia argues he was handcuffed at this point, he omitted any supporting details like which officer handcuffed him and when the handcuffs were removed. The Court considers Det. Misner and Sgt. Leonard's testimony at the hearing persuasive and finds that Garcia, like Crapser, was not handcuffed.

Garcia was not "isolated in unfamiliar surroundings" during the discussion. *Miranda*, 384 U.S. at 457. He was just outside his house on his landing and a public sidewalk, in the daytime, in plain view. *Crapser*, 472 F.3d at 1147; *see also Beckwith v. United States*, 425 U.S. 341, 346–48 (1976) (holding "an interrogation conducted in familiar surroundings weighs against a finding that the defendant was in custody.") Further "[a]lthough the [officers] were armed, they made no effort to draw [Garcia's] attention to their weapons." *Crapser*, 472 F.3d at 1146; *see also Drayton*, 536 U.S. at 205 ("the presence of a holstered firearm ... is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon.)

When Det. Misner told Garcia why he was there, and that he could smell marijuana, he "did not attempt to challenge [Garcia's] statements with other known facts, [he] merely asked him about the allegations." *Norris*, 428 F.3d at 913. When Det. Misner asked Garcia about possessing drugs, Garcia readily admitted to half an ounce similar to the way Crapser pulled out his syringe of methamphetamine. Garcia's conversation with law enforcement lasted only five minutes longer than the discussion in *Crapser*. The duration was minimal; Det. Misner asked approximately four questions.

Finally, although Garcia was not told he was free to leave, "[t]he absence of explicitly informing [Garcia] that he . . . [wa]s free to leave is not a dispositive

factor." *Redlightning*, 624 F.3d at 1103. Viewing all the facts under the objective "reasonable person" standard, Garcia's discussion with officers was voluntary and consensual. He was not in custody.

### B. Assuming Garcia was Seized, Det. Misner had Reasonable Suspicion to Conduct a *Terry* Stop.

Even if Det. Misner's discussion with Garcia was a seizure, however, it was a *Terry* stop supported by reasonable suspicion. *Crapser*, 472 F.3d at 1147. Reasonable suspicion is less than probable cause. It is "a particularized and objective basis for suspecting the person stopped of criminal activity." *Id.* In other words, a law enforcement officer may initiate a *Terry* stop when he suspects that an individual is committing, has committed, or is about to commit a crime, but probable cause does not yet exist to arrest. In determining whether Det. Misner had reasonable suspicion, the court must consider the totality of the circumstances surrounding the *Terry* stop, referencing the "collective knowledge of the officers involved, and the inferences reached by experienced, trained officers." *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

Given that two officers had reported to Det. Misner they noticed the smell of marijuana coming out of Garcia's house during a prior unrelated assault investigation, and that Det. Misner knew Garcia had a criminal background involving marijuana distribution, Det. Misner possessed a "particularized and objective basis for suspecting Garcia of criminal activity." This suspicion was

enhanced when Det. Misner noticed the smell of marijuana coming from Garcia's house when he approached Garcia's front door. At that point, considering the totality of the circumstances, Det. Misner had reasonable suspicion to conduct a *Terry* stop. *United States v. Arvizu*, 534 U.S. 266, 273-75 (2002) (overruled in part on other ground by *Davis v. Washington*, 547 U.S. 813 (2006)).

Det. Misner's protective pat down search was also supported by reasonable suspicion. In addition to authorizing an investigatory stop when there is reason to believe there is a crime being committed, *Terry* permits the officer conducting the stop to conduct a limited search of the suspect to determine whether he is armed when the circumstances give rise to a reasonable belief that the individual may have a weapon and thus pose a danger to the officer. *Id.* at 27, 30-31. Here, Garcia answered the door naked and then went back in the house and put clothes on, knowing he was going to talk to the police. In light of Garcia's association with a violent gang, it was reasonable for Det. Misner to check Garcia for weapons to ensure officer safety.

Further, there was nothing lengthy about the *Terry* stop. It lasted no more than 10 minutes (including the time Garcia was dressing) – just long enough for Det. Misner to attempt to obtain information confirming or dispelling his suspicions. *Berkemeyer v. McCarthy*, 468 U.S. 420, 439-40 (1984); *see also United States v. Place*, 462 U.S. at 709 (holding "the brevity of the invasion of the

individual's Fourth Amendment interest is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion.")

Det. Misner permissibly stopped Garcia to resolve questions about the marijuana smell coming from his house. As such, Det. Misner was not required to give Garcia a *Miranda* warning and Garcia's statements will not be suppressed.

### III. Conclusion

For all the reasons set forth above, Garcia's motion to suppress is denied.

DATED this 27th day of October, 2014.

SUSAN P. WATTERS
United States District Judge